**SUSAN MARTIN (AZ#014226)**
**MARTIN & BONNETT, PLLC**
1850 N. Central Ave. Suite 2010
Phoenix, Arizona 85004
Telephone: (602) 240-6900
smartin@martinbonnett.com

**POMERANTZ LLP**
Jeremy A. Lieberman (*pro hac vice app.* to be filed)
Lesley F. Portnoy (*pro hac vice app.* to be filed)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
lfportnoy@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom (*pro hac vice app.* to be filed)
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| DAWN E. BIEN, Individually and On Behalf of All Others Similarly Situated,<br><br>                      Plaintiff,<br><br>      v.<br><br>LIFELOCK, INC., TODD DAVIS, and CHRIS POWER<br><br>               Defendants. | **No.**<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Plaintiff Dawn E. Bien ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, for her complaint against defendants, alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding LifeLock, Inc. ("LifeLock" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired LifeLock securities between February 26, 2013 and February 19, 2014, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against the Company and certain of its top officials.

2. LifeLock is a self-proclaimed provider of proactive identity theft protection, providing its services to consumers and enterprises.

3. Since its founding in 2005, the Company has invested heavily in an aggressive advertising and marketing campaign, including through the use of

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 1 -

questionable practices, such as inducing clients to purchase its products through deceptive and fraudulent advertising practices.

4.     On March 8, 2010, the Federal Trade Commission ("FTC") filed a complaint (the "March 8 Complaint") against the Company and Defendant Todd Davis, alleging amongst other things that the Company issued dramatically misleading advertisements and guarantees to customers regarding its identity theft protection services. Specifically, the March 8 Complaint alleged that the Company's aggressive advertising campaigns misled investors into believing that the Company provided certain services and benefits which in fact were not provided. The FTC further alleged that the Company misled consumers to believe that LifeLock's protection services, "provided complete protection against all forms of identity theft by making customers' personal information useless to identity thieves." *See* March 8 Complaint at para. 23. In fact, the Company provided no real protection against identity theft.

5.     The March 8 Complaint highlighted the following fraudulent and misleading advertisements and statements by the Company:

   a.  "MY SOCIAL SECURITY # IS XXX-XX-5462. I'm Todd Davis, CEO of LifeLock, and this really is my social security number. I give it just to prove how safe your identity can be with LifeLock."

   b.  "Do you ever worry about identity theft? If so, it's time you got to know LifeLock. We work to stop identity theft before it happens. We're so confident, we back our clients with a $1 million guarantee."

   c.  "We aim to stop identity theft before it happens. . . . Every three seconds an identity is stolen. We're here to make sure it doesn't happen to you."

d. "My social security number is XXX-XX-5462. I'm Todd Davis, CEO of LifeLock, and yes, that's my real social security number. Identity theft is one of the fastest growing crimes in America, victimizing over 10 million people a year and costing billions of dollars. So why publish my social security number?  Because I'm absolutely confident LifeLock is protecting my good name and personal information, just like it will yours."

e. "By now you've heard about individuals whose identities have been stolen by identity thieves . . . . LifeLock protects against this ever happening to you. Guaranteed."

f. "LifeLock doesn't just report unauthorized use of credit information, we prevent it by working with the top four credit bureaus to make sure you're contacted to approve any credit transaction before it takes place."

g. "LifeLock clients are contacted every time someone attempts to open credit in their name or change an address."

h. "Please know that we are the first company to prevent identity theft from occurring."

i. "LifeLock will make your personal information useless to a criminal."

j. "Lifelock can keep this [identity theft] from happening to you . . . ."

k. "Every time you apply for new credit or someone tries to do something with your credit: You should receive a phone call from the bank asking if you are actually the person applying for credit in your name."

l. "We work with all major credit bureaus on an ongoing basis, setting up fraud alerts and constantly monitoring what's happening with each person's credit."

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 3 -

m. "Lifelock, the industry leader in proactive identity theft protection, offers a proven solution that prevents your identity from being stolen before it happens."

n. "So why is LifeLock CEO Todd Davis still giving out his real Social Security number to anyone who will listen? 'Because between LifeLock's proactive approach and our $1 million service guarantee, I'm more confident than ever before in LifeLock's ability to continue keeping my identity safe.'"

o. "I give [my Social Security number] out just to prove how safe your identity is with LifeLock."

*See* March 8 Complaint para. 17.

6.    In addition, the March 8 Complaint also alleged that the Company collected sensitive personally identifiable information regarding consumers, such as name, address, email address, telephone number, social security number, and credit card information.  However, the Company failed to adequately and reasonably protect this sensitive information and misled consumers regarding the nature of its data protection. *See* March 8 Complaint para. 19.

7.    As a result of its fraudulent advertising practices, in March 2010, the Company and Defendant Todd Davis entered into an settlement order (the, "Settlement Order") with the FTC whereby the Company settled allegations by the FTC that certain of the Company's advertising and marketing practices constituted deceptive acts or practices in violation of the FTC Act.

8.    The Settlement Order imposed on the Company and Defendant Davis certain injunctive provisions relating to advertising and marketing of LifeLock's

identity theft protection services, such as enjoining LifeLock from making any misrepresentation of "the means, methods, procedures, effects, effectiveness, coverage, or scope of" the Company's identity theft protection services.

9.     At the time of entering the Settlement Order, LifeLock also entered into companion orders with 35 states' attorneys general that impose on the Company similar injunctive provisions as the Settlement Order relating to LifeLock's advertising and marketing of identity theft protection services. The Settlement Order provided for a consumer redress payment of $11 million, which the Company made in 2010 to the FTC for distribution to the Company's members. The Settlement Order also provided for an additional consumer redress payment of $24 million.

10.    Despite the Company's settlement with the FTC and 35 state attorneys general, Lifelock continued its deceptive advertising practices, and on February 19, 2014, the Company announced that it had met with the FTC regarding its alleged non-compliance with the terms of the Settlement Order, after a whistleblower had discussed certain violations with the FTC. The Company stated in relevant part:

> On January 17, 2014, we met with FTC Staff, at our request, to discuss issues regarding allegations that have been asserted in a whistleblower claim against us relating to our compliance with the FTC Order. Following this meeting, we expect to receive either a formal or informal investigatory request from the FTC for documents and information regarding our policies, procedures, and practices for our services and business activities. Given the heightened public awareness of data breaches and well as attention to identity theft protection services like ours, it is also possible that the FTC, at any time, may commence an unrelated inquiry or investigation of our business practices and our compliance with the FTC Order. We endeavor to comply with all applicable laws and believe

> we are in compliance with the requirements of the FTC Order. We believe the increased regulatory scrutiny will continue in our industry for the foreseeable future and could lead to additional meetings or inquiries or investigations by the agencies that regulate our business, including the FTC.

11.     Significantly, this renewed FTC investigation, which could potentially result in significant fines against the Company, threatening its future financial viability, was not announced in a press release or prominently noted in the Company's 10-K. Rather, it was buried in the middle of a paragraph under the section "Government Regulation".  It was not until the following Sunday, February 23, 2014, that a short-seller writing on Seeking Alpha noted the buried disclosure, with an article entitled: *"Lifelock: Pending FTC Investigation Revealed in 10-K"*.

12.     On this news, shares of LifeLock fell from $21.79 to $20.32, more than 6%, on unusually heavy trading volume on February 24, 2014.

13.     Throughout the Class Period, defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company's marketing and advertising practices were in direct violation of applicable government rules and regulations; (ii) the Company was in direct violation of the Settlement Order; (iii) the Company's revenues were earned in violation of the FTC Act and the Settlement Order; and (iv) as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 6 -

**JURISDICTION AND VENUE**

14.     The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

16.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as LifeLock's principal place of business is located within this District and a substantial part of the conduct complained of herein occurred in this District.

17.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

18.     Plaintiff, as set forth in the attached Certification, acquired LifeLock securities at artificially inflated prices during the Class Period, and has been damaged upon the announcement of the alleged corrective disclosure.

19.     Defendant LifeLock is a Delaware corporation with its principal executive offices located at 60 East Rio Salado Parkway, Suite 400, Tempe, Arizona 85281. LifeLock's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "LOCK."

20.     Defendant Todd Davis ("Davis") has served as the Company's Chairman and Chief Executive Officer at all relevant times.

21.     Defendant Chris Power ("Power") has served as the Company's Chief Financial Officer at all relevant times.

22.     The defendants named in ¶¶ 20 - 21 above are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

23.     On February 26, 2013, the Company filed its annual report for the period ending December 31, 2012 with the SEC on Form 10-K. The report stated that the company, "generated revenue of $276.4 million in 2012, an increase of $82.5 million from $193.9 million in 2011. The increase was driven by $21.8 million in revenue from our enterprise segment since the acquisition of ID Analytics in March 2012 and organic growth in our consumer segment of approximately 31%."

24.     In the 2012 annual report the Company further stated that:

> We have historically invested aggressively in new member acquisition and expect to continue to do so for the foreseeable future. Our largest operating expense is advertising for member acquisition, which we record as a sales and marketing expense. This is comprised of radio, television, and print advertisements; direct mail campaigns; online display advertising; paid search and search-engine optimization; third-party endorsements; and education programs. In 2012, 2011, and 2010, our total advertising expense was $66.0 million, $54.6 million, and $42.7 million, respectively. We also pay internal and external sale commissions, which we record as a sales and marketing expense.

25.     Regarding the Company's entering into the Settlement Order, and its

compliance thereto, the 10-K stated:

> In March 2010, we and Todd Davis, our Chairman and Chief Executive Officer, entered into a Stipulated Final Judgment and Order for Permanent Injunction and Other Equitable Relief with the FTC, which we refer to as the "FTC Order." The FTC Order was the result of a settlement of the allegations by the FTC that certain of our advertising and marketing practices constituted deceptive acts or practices in violation of the FTC Act, which settlement made no admission as to the allegations related to such practices. The FTC Order imposes on us and Mr. Davis certain injunctive provisions relating to our advertising and marketing of our identity theft protection services, such as enjoining us from making any misrepresentation of "the means, methods, procedures, effects, effectiveness, coverage, or scope of" our identity theft protection services. However, the bulk of the more specific injunctive provisions have no direct impact on the advertising and marketing of our current services because we have made significant changes in the nature of the services we offer to consumers since the investigation by the FTC in 2007 and 2008, including our adoption of new technology that permits us to provide proactive protection against identity theft and identity fraud. The FTC investigation of our advertising and marketing activities occurred during the time that we relied significantly on the receipt of fraud alerts from the credit reporting agencies for our members. The FTC believed that such alerts had inherent limitations in terms of coverage, scope, and timeliness. Many of the allegations in the FTC complaint, which accompanied the FTC Order, related to the inherent limitations of using credit report fraud alerts as the foundation for identity theft protection. Because the injunctive provisions in the FTC Order are tied to these complaint allegations, these injunctive provisions similarly relate significantly to our previous reliance on credit report fraud alerts as reflected in our advertising and marketing claims. The FTC Order also imposes on us and Mr. Davis certain injunctive provisions relating to our data security for members' personally identifiable information. At the same time, we also entered into companion orders with 35 states' attorneys general that impose on us similar injunctive provisions as the FTC Order

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                    - 9 -

relating to our advertising and marketing of our identity theft protection services.

Our or Mr. Davis' failure to comply with these injunctive provisions could subject us to additional injunctive and monetary remedies as provided for by federal and state law. In addition, the FTC Order imposes on us and Mr. Davis certain compliance requirements, including the delivery of an annual compliance report. We and Mr. Davis have timely submitted these annual compliance reports, but the FTC has not accepted or approved them to date. If the FTC were to find that we or Mr. Davis have not complied with the requirements in the FTC Order, we could be subject to additional penalties and our business could be negatively impacted.

26.     In its annual report Defendants Davis and Power signed a certification pursuant to Section 302 of the Sarbanes Oxley Act of 2002 (the, "SOX Certifiation") whereby both defendants certified the following:

1. I have reviewed this Quarterly Report on Form 10-Q of LifeLock, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be

designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

27.     On May 3, 2013, the Company filed its quarterly report for the period ending March 31, 2013 with the SEC on Form 10-Q. For the quarter the Company reported, "revenue of $82.1 million, an increase of 42% from the three-month period ended March 31, 2012, which only included enterprise revenue subsequent to our acquisition of ID Analytics. Revenue in our consumer segment was $75.1 million for

the three-month period ended March 31, 2013, a 32% increase from $56.7 million for the three-month period ended March 31, 2012. We generated a net loss from operations of $3.9 million and a net loss of $4.1 million for the three-month period ended March 31, 2013."

28.    In addition, Defendants Davis and Power signed a certification similar in form to the SOX Certification referenced above.

29.    The Company further stated that:

> We have historically invested aggressively in new member acquisition and expect to continue to do so for the foreseeable future. Our largest operating expense is advertising for member acquisition, which we record as a sales and marketing expense. This is comprised of radio, television, and print advertisements; direct mail campaigns; online display advertising; paid search and search-engine optimization; third-party endorsements; and education programs. We also pay internal and external sale commissions, which we record as a sales and marketing expense.

30.    On August 1, 2013, the Company filed its quarterly report for the period ended June 30, 2013 with the SEC on Form 10-Q. In its quarterly report, the Company informed investors:

> For the three-month period ended June 30, 2013, we recorded revenue of $89.5 million, an increase of 32% from the three-month period ended June 30, 2012. Revenue in our consumer segment was $82.6 million for the three-month period ended June 30, 2013, a 34% increase from $61.6 million for the three-month period ended June 30, 2012. We generated a net loss from operations of $2.2 million and a net loss of $2.1 million for the three-month period ended June 30, 2013. For the six-month period ended June 30, 2013, we recorded revenue of $171.6 million, an increase of 37% from the six-month period ended June 30, 2012, which only included enterprise revenue subsequent to our acquisition of ID

Analytics. In addition, Defendants Davis and Power signed certification similar in form to the SOX Certification referenced above.

31.     The Company further stated that:

We have historically invested aggressively in new member acquisition and expect to continue to do so for the foreseeable future. Our largest operating expense is advertising for member acquisition, which we record as a sales and marketing expense. This is comprised of radio, television, and print advertisements; direct mail campaigns; online display advertising; paid search and search-engine optimization; third-party endorsements; and education programs. We also pay internal and external sale commissions, which we record as a sales and marketing expense.

32.     On or about October 30, 2013, the Company filed its quarterly report for the period ended September 30, 2013 with the SEC on Form 10-Q. The Company informed investors that:

For the three-month period ended September 30, 2013, we recorded revenue of $95.7 million, an increase of 33% from the three-month period ended September 30, 2012. Revenue in our consumer segment was $88.4 million for the three-month period ended September 30, 2013, a 35% increase from $65.6 million for the three-month period ended September 30, 2012. We generated income from operations of $5.7 million and net income of $5.4 million for the three-month period ended September 30, 2013. For the nine-month period ended September 30, 2013, we recorded revenue of $267.4 million, an increase of 35% from the nine-month period ended September 30, 2012, which only included enterprise revenue subsequent to our acquisition of ID Analytics. Revenue in our consumer segment was $246.1 million for the nine-month period ended September 30, 2013, a 34% increase from $183.9 million for the nine-month period ended September 30, 2012. We generated a loss from operations of $0.4 million and a net loss of $0.8 million for the nine-month period ended September 30, 2013.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 13 -

33.     In addition, Defendants Davis and Power signed a certification similar in form to the SOX Certification referenced above.

34.     The Company further stated that:

> We have historically invested aggressively in new member acquisition and expect to continue to do so for the foreseeable future. Our largest operating expense is advertising for member acquisition, which we record as a sales and marketing expense. This is comprised of radio, television, and print advertisements; direct mail campaigns; online display advertising; paid search and search-engine optimization; third-party endorsements; and education programs. We also pay internal and external sale commissions, which we record as a sales and marketing expense.

35.     The above statements were materially false and misleading regarding the Company's business and operations. Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company's marketing and advertising practices were in direct violation of applicable government rules and regulations; (ii) the Company was in direct violation of the Settlement Order; (iii) the Company's revenues were earned in violation of the FTC Act and the Settlement Order; and, (iv) as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

## **THE TRUTH EMERGES**

36.     On February 19, 2014, LifeLock announced that it had met with the FTC regarding its compliance with the terms of the Settlement Order, after a whistleblower had discussed certain violations thereof with the FTC. The Company stated in relevant part:

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 14 -

On January 17, 2014, we met with FTC Staff, at our request, to discuss issues regarding allegations that have been asserted in a whistleblower claim against us relating to our compliance with the FTC Order. Following this meeting, we expect to receive either a formal or informal investigatory request from the FTC for documents and information regarding our policies, procedures, and practices for our services and business activities. Given the heightened public awareness of data breaches and well as attention to identity theft protection services like ours, it is also possible that the FTC, at any time, may commence an unrelated inquiry or investigation of our business practices and our compliance with the FTC Order. We endeavor to comply with all applicable laws and believe we are in compliance with the requirements of the FTC Order. We believe the increased regulatory scrutiny will continue in our industry for the foreseeable future and could lead to additional meetings or inquiries or investigations by the agencies that regulate our business, including the FTC.

37.     Significantly, this renewed FTC investigation, which could potentially result in significant fines against the Company, was not announced in a press release or prominently noted in the Company's 10-K.  Rather, it was buried in the middle of a paragraph under the section "Government Regulation".  It was not until the following Sunday, February 23, 2014, that a short-seller writing on Seeking Alpha noted the buried disclosure, with an article entiled:   *"Lifelock: Pending FTC Investigation Revealed in 10-K"*.

38.     On this news, shares of LifeLock fell from $21.79 to $20.32, more than 6%, on unusually heavy trading volume on February 24, 2014.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

39.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who

purchased or otherwise acquired LifeLock securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

40.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, LifeLock securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by LifeLock or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

41.  Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

42.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

43.  Common questions of law and fact exist as to all members of the Class

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 16 -

and predominate over any questions solely affecting individual members of the Class.

Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by the Individual Defendants to the investing public during the Class Period misrepresented and/or omitted material facts about the business, prospects, and operations of LifeLock

- whether defendants acted knowingly or recklessly (i.e., with scienter) in issuing false and misleading financial statements;

- whether the prices of LifeLock securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

44.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD-ON-THE-MARKET DOCTRINE**

45.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 17 -

- the omissions and misrepresentations were material;

- the Company's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period (ranging from hundreds of thousands to millions of shares per week);

- as a regulated issuer, the Company filed with the SEC periodic reports during the Class Period;

- the Company regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company was followed by multiple securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period; these reports was publicly available and entered the public marketplace;

- numerous FINRA member firms were active market-makers in the Company's stock at all times during the Class Period; and

- unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

46.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

47.     Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants

omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of § 10(b) of the Exchange Act, and Rule 10b-5 Promulgated Thereunder, Against LifeLock, and the Individual Defendants

48.    Plaintiff repeat and reallege the allegations contained above as if fully set forth herein.

49.    During the Class Period, LifeLock and the Officer Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

50.    The Officer Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Companies' units and shares during the Class Period.

51.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for LifeLock shares. Plaintiff and the Class would not have purchased LifeLock shares at the prices they paid, or at all,

if they had been aware that the market prices had been artificially and falsely inflated by the Officer Defendants' misleading statements.

52.    As a direct and proximate result of the Officer Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of LifeLock shares during the Class Period.

## COUNT II

### Violation of § 20(a) of the Exchange Act
### Against the Individual Defendants

53.    Plaintiff repeats and realleges the allegations contained above as if fully set forth herein.

54.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of LifeLock, were privy to confidential and proprietary information concerning LifeLock, its operations, finances, financial condition and present and future business prospects.  The Individual Defendants also had access to material adverse non-public information concerning LifeLock, as detailed in this Complaint. Because of their positions within LifeLock, the Individual Defendants had access to non-public information about the business, finances, products, markets and present and future business prospects of LifeLock via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the

adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

55.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause LifeLock to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of the business of LifeLock.

56.     The Individual Defendants, because of their positions with LifeLock, controlled and/or possessed the authority to control the contents of LifeLock's reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of LifeLock's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

57.     The Individual Defendants, as senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, governed by the federal securities laws and is registered with the NYSE, had a duty to promptly disseminate accurate and truthful information with respect to LifeLock's financial condition, cash flow, performance, growth, operations, financial statements,

business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of LifeLock shares would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

58.    The Individual Defendants acted as controlling persons of LifeLock within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of LifeLock, and their ownership of LifeLock shares, the Individual Defendants had the power and authority to cause LifeLock to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongful acts and misconduct as alleged herein, in an amount to be proven at trial;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other

costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated this 3rd day of March, 2013.

MARTIN & BONNETT, P.L.L.C.

By:   s/Susan Martin
Susan Martin
1850 N. Central Ave. Suite 2010
Phoenix, AZ 85004
Telephone: (602) 240-6900
Facsimile:  (602) 240-2345
smartin@martinbonnett.com

**POMERANTZ LLP**
Jeremy A. Lieberman (*pro hac vice* app. to be filed)
Lesley F. Portnoy (*pro hac vice* app. to be filed)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
jalieberman@pomlaw.com
lfportnoy@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom (*pro hac vice* app. to be filed)
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
pdahlstrom@pomlaw.com

***Attorneys for Plaintiff***

**CERTIFICATION PURSUANT
TO FEDERAL SECURITIES LAWS**

1.  I, _Dawn E. Bein_, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against LifeLock, Inc. ("LifeLock" or the "Company"), and authorize the filing of a comparable complaint on my behalf.

3. I did not purchase or acquire LifeLock securities at the direction of plaintiffs counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.  I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired LifeLock securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5. To the best of my current knowledge, the attached sheet lists all of my transactions in LifeLock securities during the Class Period as specified in the Complaint.

6. During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.  I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.

Executed ___Feb. 26, 2014___
             **(Date)**

_____Dawn E. Bein_____
             **(Signature)**

_____Dawn E. Bein_____
             **(Type or Print Name)**

LIFELOCK, INC. (LOCK)                                      **Bein, Dawn**

### LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|------------------|-------------------|-----------------|
| 01/13/2014 | PUR | 55 | $18.2245 |
| 02/19/2014 | PUR | 50 | $22.5836 |
| 02/19/2014 | PUR | 45 | $22.5838 |