**NOT FOR PUBLICATION**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Dawn E. Bien, et al., | No. CV-14-00416-PHX-SRB |
| Plaintiffs, | **ORDER** |
| v. | |
| LifeLock Incorporated, et al., | |
| Defendants. | |

The Court now considers Defendants' Motion to Dismiss Second Consolidated Amended Class Action Complaint for Violations of Federal Securities Laws ("MTD") (Doc. 77). The Court heard oral argument on March 16, 2015. (Doc. 85, Minute Entry.)

## I.    BACKGROUND

The Court has summarized the facts of this case in a previous Order, which is fully incorporated herein. (*See* Doc. 70, Dec. 17, 2014 Order at 1-2.) The Court dismissed Plaintiffs' Consolidated Amended Class Action Complaint ("CAC"), finding that the CAC failed to sufficiently allege a violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5, 17 C.F.R. § 240.10b-5. (*Id.* at 12-13.) The Court specifically concluded that the CAC had failed to adequately allege that Defendants made a false or misleading statement concerning LifeLock Incorporated's ("LifeLock") compliance with a 2010 FTC Settlement Order ("FTC Order"). The FTC Order prohibits LifeLock from misrepresenting the methods and effectiveness of its

identity theft protection services. (*Id.* at 5-7.) The Court also concluded that the CAC failed to allege that Defendants had made a misleading statement concerning its compliance with applicable payment card industry ("PCI") security standards or that any allegedly misleading statement was made with scienter. (*Id.* at 8-12.) Plaintiffs have filed a Second Consolidated Amended Class Action Complaint ("SCAC"). (Doc. 75.) Defendants move to dismiss the SCAC, arguing that the SCAC fails to adequately plead that Defendants made a false or misleading statement or that any of Defendants' allegedly false or misleading statements were made with scienter. (MTD at 2-27.)[1]

## II.   LEGAL STANDARDS AND ANALYSIS

### A.   Legal Standards

Rule 12(b)(6) dismissal for failure to state a claim can be based on either (1) the lack of a cognizable legal theory or (2) insufficient facts to support a cognizable legal claim. *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011), *cert. denied*, *Blasquez v. Salazar*, 132 S. Ct. 1762 (2012). In determining whether an asserted claim can be sustained, "[a]ll of the facts alleged in the complaint are presumed true, and the pleadings are construed in the light most favorable to the nonmoving party." *Bates v. Mortg. Elec. Registration Sys., Inc.*, 694 F.3d 1076, 1080 (9th Cir. 2012). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those

---

[1] Defendants also argue that the SCAC fails to adequately plead that any economic loss was caused by Defendants' allegedly false or misleading statements. (MTD at 27); *see also Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014) (outlining the elements necessary to state a claim under Section 10(b) of the Exchange Act). Because the Court concludes that the SCAC fails to adequately plead falsity and scienter, the Court does not reach the issue of whether the SCAC adequately pleads loss causation.

The parties dispute whether the Court can take judicial notice of an online news article written by Jon C. Ogg for the website *24/7 Wall St.* that is referenced in the SCAC. (*See* Doc. 79, Req. for Judicial Notice at 2 (citing SCAC ¶ 271); Doc. 82, Resp. to Req. for Judicial Notice at 1.) Defendants request that the Court consider the entire online article, arguing that the article is properly noticeable under the incorporation by reference doctrine because it is quoted and necessarily relied upon in the SCAC. (Req. for Judicial Notice at 2-3.) Even if the Court were to consider the entire online article for the truth of its factual content, the portions of the article not cited in the SCAC are not relevant to the Court's determination of whether Plaintiffs have stated a legal claim. The Court therefore denies Defendants' judicial notice request.

facts is improbable, and 'that a recovery is very remote and unlikely.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). However, "for a complaint to survive a motion to dismiss, the nonconclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In other words, the complaint must contain enough factual content "to raise a reasonable expectation that discovery will reveal evidence" of the claim. *Twombly*, 550 U.S. at 556.

Section 10(b) or Rule 10b-5 claims also must meet the particularity requirements of Federal Rule of Civil Procedure 9(b), which requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see also In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1014 (9th Cir. 2005). Moreover, these claims must meet the heightened pleading standards of the Private Securities Litigation Reform Act ("PSLRA"). *See* 15 U.S.C. § 78u-4. The PSLRA requires a securities fraud complaint to "plead with particularity both falsity and scienter." *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002). To properly allege falsity, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." *Id.* (quoting 15 U.S.C. § 78u-4(b)(1)) (quotation marks omitted). To adequately plead scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). To adequately demonstrate that the "defendant acted with the required state of mind," a complaint must "allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *In re Daou Sys.*, 411 F.3d at 1014-15. "[A]n actor is [deliberately] reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have

done so without extraordinary effort." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010) (quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000)). The Supreme Court has emphasized that courts "must review all the allegations holistically" when determining whether scienter has been sufficiently pled. *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1324 (2011) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007)). The relevant inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323. In securities cases, falsity and scienter "are generally strongly inferred from the same set of facts" and the two requirements may be combined into a unitary inquiry under the PSLRA." *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2011).

### B.   Analysis

#### 1.   Compliance with the FTC Order

In the initial dismissal Order, the Court concluded that Plaintiffs had failed to sufficiently allege that Defendants made a false or misleading statement related to LifeLock's compliance with the FTC Order. (*See* Dec. 17, 2014 Order at 5-8 (stating that the FTC-related statement at issue was not misleading because, when read in context, it did not "'affirmatively create an impression' that LifeLock was actually in compliance with the FTC Order").) Similar to the CAC, the SCAC lists extensive excerpts from LifeLock's various SEC filings and public statements made by Defendants Davis and Power that reference the FTC Order. (*See, e.g.*, SCAC ¶¶ 211-16, 220-22, 228-30, 234-36.) The SCAC emphasizes some of the excerpts in bold typeface, which is presumably meant to indicate a false or misleading statement. Almost all of the statements referencing the FTC Order were previously alleged in the dismissed CAC. (*Compare id.*, *with* CAC ¶¶ 170-76, 178-80, 182-84, 188-90.) Plaintiffs have included one additional statement from LifeLock's 2013 Form 10-K related to Defendants' FTC compliance that was not alleged as a false or misleading statement in the CAC:

> On January 17, 2014, we met with FTC Staff, at our request, to discuss issues regarding allegations that have been asserted in a whistleblower

claim against us relating to **our compliance with the FTC Order.** Following this meeting, we expect to receive either a formal or informal investigatory request from the FTC for documents and information regarding our policies, procedures, and practices for our services and business activities. Given the heightened public awareness of data breaches and well as attention to identity theft protection services like ours, it is also possible that the FTC, at any time, may commence an unrelated inquiry or investigation of our business practices and our compliance with the FTC Order. **We endeavor to comply with all applicable laws and believe we are in compliance with the requirements of the FTC Order.** We believe the increased regulatory scrutiny will continue in our industry for the foreseeable future and could lead to additional meetings or inquiries or investigations by the agencies that regulate our business, including the FTC.

(SCAC ¶ 239.)

### a. Opinion Statement

Defendants argue that the above statement "we . . . believe we are in compliance with the requirements of the FTC Order" is an opinion statement and Plaintiffs' allegations "fail to satisfy the legal requirement for alleging statements of belief and opinion to be false." (MTD at 10-13.) The Supreme Court has recently addressed the standard for determining whether a statement of opinion or belief is actionable as securities fraud. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1325-32 (2015). In *Omnicare*, the Supreme Court confirmed that "a sincere statement of pure opinion is not an 'untrue statement of . . . fact'" simply because the stated opinion ultimately proves incorrect. *Id.* at 1327. The Court also concluded that opinion statements are not wholly immune from liability and may be considered material misstatements or omissions in certain circumstances. *Id.* at 1326-28. In the omission context, the Court stated that "depending on the circumstances, [a reasonable investor may] understand an opinion statement to convey facts about how the speaker has formed the opinion." *Id.* at 1328. If a party's opinion statement "omits material facts about the [party's] inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself," liability may accrue. *Id.* at 1329.[2] The Court also stated that an opinion

---

[2] The *Omnicare* opinion provides a straightforward example: if a speaker states

statement is not necessarily misleading "when an issuer knows, but fails to disclose, some fact cutting the other way," as a reasonable investor "does not expect that every fact known to an issuer supports its opinion statement." *Id.* The Court further explained that "whether an omission makes an expression of opinion misleading always depends on context," noting that an investor reads each statement, "whether of fact or opinion, in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information." *Id.* at 1330. In order to sufficiently allege that a statement of opinion is actionable a plaintiff

> must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.

*Id.* at 1332.

Plaintiffs argue that LifeLock's 2013 Form 10-K omitted the fact that Defendants Davis and Power were aware that LifeLock failed to send out a number of alerts to customers as advertised (a practice known as "throttling"). (Doc. 81, Resp. in Opp'n to MTD ("Resp. to MTD") at 12-13 (citing SCAC ¶¶ 73-81, 85, 90 (alleging that LifeLock's practice of throttling was described in both a wrongful termination and a whistleblower complaint), 145-47 (alleging that Defendants Davis and Power were present at meetings addressing LifeLock's failure to send out timely alerts), 179-80 (alleging that the Chief Marketing Officer informed Defendant Davis that the LifeLock's advertising would have to change in light of throttling)).) Plaintiffs argue that because this practice was not disclosed in the 2013 Form 10-K, this omission renders LifeLock's opinion that it was in compliance with the FTC Order misleading. (*Id.*) Defendants counter that even if the SCAC sufficiently alleges that Defendants were aware that a number of alerts were not being timely sent to LifeLock customers, the SCAC fails to

---

that he believes his conduct is lawful but has failed to consult a lawyer before making this statement, it could be actionable as a misleading opinion statement. *Omnicare*, 135 S. Ct. at 1328.

allege that these service lapses were "indicative of anything beyond an ordinary quality-control problem" or that Defendants "knew that such lapses put LifeLock in violation of the FTC Order." (MTD at 12; *see also id.* at 12 n.24 (noting that LifeLock has 3.2 million members, so even if thousands of alerts were unsent, this lapse "may have been minuscule in comparison to the number of alerts sent").) Defendants argue that without such allegations, Plaintiffs have failed to allege that the opinion statement that LifeLock was in compliance with the FTC Order was a misleading statement under the Exchange Act. (*Id.* at 12-13.)

Plaintiffs have failed to sufficiently allege that Defendants were aware of undisclosed, material facts whose omission rendered the opinion statement at issue misleading in the context of the 2013 Form 10-K. Even if Plaintiffs have sufficiently alleged that Defendants knew LifeLock was sending out delayed alerts to certain customers, conclusory allegations that "Defendants flagrantly violated the terms of the [FTC] Order" are insufficient to demonstrate that Defendants knew or reasonably should have known that this practice violated the FTC Order. (*See* SCAC ¶ 69.) The SCAC does not contain sufficient factual allegations demonstrating that Defendants knew the extent of LifeLock's throttling practice or whether this practice was actually pervasive enough to put LifeLock in violation of the FTC Order. (*See, e.g.*, *id.* ¶¶ 76-77 (alleging only that a former employee expressed concern to "LifeLock personnel" that throttling "might violate" the FTC Order).) The SCAC also contains allegations that after Defendants became aware of the service lapses, they acted to resolve the issues and altered their advertisements to reflect the delayed alerts. (*See id.* ¶ 145 (alleging that a confidential witness claimed Defendant Davis was "very well aware of the system issues" and Davis stated that LifeLock was "bringing on new people and reorganizing the technology department" to address them), 179-80 (alleging that after a confidential witness told Defendant Davis that LifeLock's advertising would have to change to reflect LifeLock's throttling of alerts, this confidential witness received approval to change the advertising and the advertising was in fact temporarily changed).) Even if Plaintiffs have sufficiently

alleged that Defendants were aware of LifeLock's throttling practice, the Court cannot conclude that Plaintiffs have sufficiently alleged that Defendants were aware of undisclosed material facts tending to significantly undermine the accuracy of their belief that LifeLock was still in compliance with the FTC Order.

The context in which LifeLock expressed its opinion concerning its compliance with the FTC Order further supports the conclusion that LifeLock's alleged omission does not render the opinion statement misleading. *See Omnicare*, 135 S. Ct. at 1330 (stating that "an omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame"). In addition to the opinion statement at issue, LifeLock's 2013 Form 10-K contained negative disclosures concerning the effect of its rapid growth on its services. (*See* Doc. 51-1, 2013 Form 10-K.)[3] LifeLock specifically disclosed that it had experienced substantial growth, which "place[d] a strain on [its] operational, financial, and management infrastructure," and warned that its "failure to effectively manage growth could have a material adverse effect on [its] business . . . [and] operating results." (*Id.* at 18; *see also id.* at 17 (warning that its business could be adversely affected by "challenges encountered by companies that are rapidly developing and are experiencing rapid growth in evolving industries").) LifeLock also acknowledged that its business could be harmed if LifeLock experienced problems related to "customer service and responsiveness to any customer complaints" or it is not able to update its technology to match its growth, which would cause "outages" or "disruption[s] in [LifeLock's] business operations." (*Id.* at 15-17.) LifeLock also disclosed the FTC Order's injunctive terms (including LifeLock's submission of an annual compliance report) and the consequences of and penalties for noncompliance with those terms. (*Id.* at 9-10.) LifeLock stated that although it had submitted its annual compliance report, it had not been accepted or approved by the FTC. (*Id.* at 10.) LifeLock also disclosed that it had recently met with

---

[3] LifeLock's SEC filings are properly noticeable because they "are matters of public record and are capable of accurate and ready determination." (Dec. 17, 2014 Order at 2-3.)

1    FTC staff to discuss allegations of noncompliance with the FTC Order, that it expected to

2    receive an investigatory request from the FTC for documents and information regarding

3    its business practices, and that the FTC may begin an investigation of LifeLock's

4    business practices or compliance with the FTC Order. (*Id.*) In light of these negative

5    disclosures concerning potential service disruptions due to LifeLock's rapid growth,

6    allegations of noncompliance with the FTC Order, and LifeLock's anticipation of an FTC

7    investigation, the Court cannot conclude that Defendants' failure to specifically disclose

8    their knowledge of unsent or delayed alerts rendered the opinion statement "misleading to

9    a reasonable person reading the statement fairly and in context." *See Omnicare*, 135 S.

10   Ct. at 1332.

11              **b.    Statements Previously Alleged in CAC**

12              Defendants argue that the remaining statements concerning LifeLock's

13   compliance with the FTC Order were previously alleged in the dismissed CAC and,

14   therefore, the Court has already determined that these statements are not false or

15   misleading. (MTD at 1-3.) The Court previously stated that the "overall picture presented

16   in . . . the Form 10-K is that LifeLock incurs costs in an effort to comply with the FTC

17   Order, however, LifeLock clearly acknowledges that it may be determined that it is not in

18   compliance with the FTC Order." (Dec. 17, 2014 at 7-8.) The Court concluded that a

19   reasonable investor would not understand that LifeLock was representing it was in fact in

20   compliance with the FTC Order. (*Id.*) Plaintiffs argue that they have cured the CAC's

21   deficiencies because the SCAC includes an allegation that a Deutsche Bank Market

22   Research ("DBMR") analyst who covered LifeLock understood that Defendants

23   represented LifeLock was in compliance with the FTC Order and, therefore, the SCAC

24   sufficiently alleges that the FTC-related statements in the 2013 Form 10-K are

25   misleading. (Resp. to MTD at 16; *see also* SCAC ¶ 255.) Plaintiffs also argue that all of

26   the FTC-related statements are actionable as incomplete statements because the SCAC

27   includes allegations that LifeLock's Code of Business Conduct and Ethics required "only

28   complete, factual and truthful statements about [the] Company." (Resp. to MTD at 16-17;

*see also* SCAC ¶ 72.) Plaintiffs contend that Defendants were obligated to discuss those practices, such as throttling, "that comprised outright violations of the FTC [Order]." (Resp. to MTD at 15.)

Plaintiffs' additions fail to cure the deficiencies identified in the Court's previous Order. The SCAC alleges that the DBMR analyst stated, in relevant part:

> [W]e view LifeLock's meeting with the FTC, and subsequent 10-[K] disclosure as an effort to be more transparent with investors. . . . LifeLock has already settled [a whistleblower lawsuit filed with the FTC], and is engaging proactively with the FTC, as they have been since 2010 **to stay compliant with FTC regulations.**

(SCAC ¶ 255.) As an initial matter, the Court notes that the statements made by the DBMR analyst are not alleged in the SCAC as evidence of the market's understanding of LifeLock's statements in the 2013 Form 10-K, but instead are alleged to be actionable statements made by a third party. (*See* SCAC ¶ 256 (stating that "[t]he [analyst's] statements in Paragraph 255 above were materially false when made, and/or omitted material information necessary to make the statements not misleading . . ."); *see also* Resp. to MTD at 16 n.8 (disputing Defendants' assertion that the analyst's statements cannot support a securities fraud claim).) To the extent Plaintiffs argue that the statement concerning FTC compliance in the DBMR report can support a securities fraud claim, the Court disagrees. The DBMR report does not identify which (if any) LifeLock employee affirmatively stated that the company was compliant with the FTC Order and therefore this is not an actionable third party statement. *See Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1235 (9th Cir. 2004) (stating that a statement made by a third party is only actionable when it "clearly originated" from the defendants). Plaintiffs also fail to identify the specific statements upon which the analyst's belief is based. Without such allegations, the Court cannot determine which statement the market allegedly understood to represent that LifeLock was actually in compliance with the FTC Order. Because the analyst's statements do not sufficiently demonstrate that Defendants made a false or misleading statement within the context of LifeLock's 2013 Form 10-K concerning its FTC compliance, this allegation fails to cure the deficiencies identified in

the CAC.

Plaintiffs' allegations that LifeLock's Code of Business Ethics "required only complete, factual and truthful statements about [the] Company" also fails to cure the deficiencies identified in the Order dismissing the CAC. As discussed in the initial dismissal Order, Section 10(b) of the Exchange Act prohibits "only misleading and untrue statements, not statements that are incomplete." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) ("No matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not."); (*see* Dec. 17, 2014 Order at 7.) Even assuming that an incomplete statement concerning LifeLock's compliance with the FTC Order could be actionable as securities fraud, in light of the negative disclosures in LifeLock's 2013 Form 10-K discussed above, the Court cannot conclude the allegedly misleading statements Plaintiffs identify were incomplete when read in context. Because Plaintiffs have not sufficiently alleged that Defendants made a false or misleading statement concerning LifeLock's compliance with the FTC Order, the amendments in the SCAC fail to cure the deficiencies identified in the Court's prior Order.

### 2.  Compliance with PCI Standards

In the initial dismissal Order, the Court concluded that even if Plaintiffs had made a misleading statement concerning LifeLock's compliance with the applicable PCI security standards, Plaintiffs had failed to allege that any such statement was made with scienter. (*See* Dec. 17, 2014 Order at 8-12 (stating that Plaintiffs "fail[ed] to sufficiently allege that Defendants intentionally or with deliberate recklessness made a misleading statement concerning" LifeLock's PCI certification, general compliance with PCI standards, or LifeLock's mobile Wallet application's PCI compliance).) In the SCAC Plaintiffs re-allege two statements addressed in the Court's previous Order:

> "We have received a PCI Level 1 certification in our consumer and enterprise businesses . . . ." [(SCAC ¶ 247 (quoting LifeLock's 2013 Form 10-K).)]

> . . . .

> We have continually invested knowing that the credibility hit to our brand if we have a data compromise is meaningful and material. So we, **our standard is in just the PCI level 1 certification that we're proud to have, which courses [sic] the data handling, data security certification that all your major financial institution, the highest level of certification you can have.**
>
> Certainly we're proud to have the monitor PCI level 1 but know that's not the bar that we said is [sic] just to achieve PCI level 1. **It is to make sure that we are constantly looking at were there points of vulnerability, points of attack, new and innovative threats. And we're constantly investing on that front to make sure that we are protecting that enterprise and consumer data. So that we can maintain our trusted relationship with the brand.** [(*Id.* ¶ 258 (quoting Defendant Davis at an Investor and Analyst Day).)]

(*See also* Dec. 17, 2015 Order at 8-10.) The SCAC also alleges that the following statements are either false or misleading because LifeLock's operations and the mobile Wallet application were not PCI-compliant:

> LifeLock identify theft protection helps proactively safeguard your credit, your finances and your good name . . . . [(*Id.* ¶ 224 (quoting a June 28, 2013 advertisement).)]
>
> . . . .
>
> The LifeLock Wallet mobile application allows . . . mobile use of items such as credit, identification, ATM, insurance, and loyalty cards. [(*Id.* ¶ 250 (quoting LifeLock's 2013 Form 10-K).)]
>
> . . . .
>
> As you know, we acquired Lemon, Inc. late in the fourth-quarter. . . . We can now help organize what's in your wallet and protect it as well. [(*Id.* ¶ 253 (quoting a statement made by Defendant Davis at LifeLock's Q4 2013 Earnings Call).)]

Plaintiffs allege that the above statements were false or misleading because LifeLock was not capable of "safeguard[ing]" or "protect[ing]" its customers' personal information as claimed because its general services were not PCI-compliant, and the Wallet application did not actually permit the customers' mobile use of their credit or identity cards because the application also was not PCI-compliant. (*See id.* ¶¶ 225(f), 252(*l*), 254(a).) Defendants argue that Plaintiffs have failed to sufficiently establish that the above statements are false or misleading because the statements do not reference the PCI standards, let alone assert that LifeLock or its Wallet application were in compliance with

these standards. (MTD at 20-22.) Defendants also argue that even if LifeLock was not PCI-compliant, the SCAC does not sufficiently allege that the Wallet application did not permit the mobile uses indicated, or that LifeLock was actually incapable of protecting its customers' information. (*Id.*)

Even if the Court were to conclude that the above statements concerning PCI compliance are misleading, Plaintiffs have again failed to adequately plead that the statements were made with scienter. *See* 15 U.S.C. § 78u-4(b)(2) (requiring scienter to be plead "with respect to each act or omission alleged to violate this chapter"). For each of the above statements, Plaintiffs allege that "Defendants had actual knowledge of this PCI noncompliance and/or were reckless in rushing the Wallet App onto the market." (*See* SCAC ¶¶ 252(m), 259(j), 254(b).)[4] The SCAC appears to rely on the following allegations to support Plaintiffs' position that Defendants "had actual knowledge" of LifeLock's and its Wallet application's PCI noncompliance: (1) statements of three confidential witnesses ("CW-2," "CW-4," and "CW-5"), (2) statements of former LifeLock employee Michael Peters, and (3) statements made in filing the corporation's Sarbanes–Oxley certifications. (*See* SCAC ¶¶ 82-91, 108-29, 149-73, 216.) In the initial dismissal Order, the Court concluded that the allegations related to CW-2 (previously identified as "CW-3"), Michael Peters, and the Sarbanes–Oxley certifications failed to sufficiently establish that Defendants intentionally or with deliberate recklessness made a misleading statement concerning LifeLock's or its Wallet application's PCI compliance. (*See* Dec. 17, 2014 Order at 9-12.) Plaintiffs have re-alleged these allegations without amendments and the Court concludes that they fail to raise a strong inference of scienter for the same reasons identified in its previous Order. (*See id.*)

The Court also concludes that the allegations of CW-4 and CW-5 fail to establish

---

[4] Plaintiffs also allege throughout the SCAC that certain statements were made with scienter because they related to matters that were part of LifeLock's "core operations." (*See, e.g.*, SCAC ¶¶ 225(g), 252(j), 259(h).) It is unclear from the SCAC whether Plaintiffs allege that PCI compliance is part of LifeLock's core operations. Because Plaintiffs only argue that LifeLock's compliance with the FTC Order is part of its core operations, the Court will not address the "core operations" theory of scienter for those statements related to PCI compliance. (*See* Resp. to MTD at 27-28.)

that Defendants had actual knowledge or recklessly disregarded LifeLock's or its Wallet application's PCI noncompliance.

> [A] complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements. First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge. Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter.

*Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009) (citations omitted). In analyzing the first prong, whether the confidential witnesses have personal knowledge of the events they allege, a court must "look to 'the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia.'" *Id.* (quoting *In re Daou Sys.*, 411 F.3d at 1015). Here, Plaintiffs describe CW-4 and CW-5 with some "degree of specificity." *See In re Daou Sys.*, 411 F.3d at 1016. The SCAC provides job titles, dates of employment, and the employee to whom the witness reported. (*See* SCAC ¶¶ 149-53, 169-70.) Many of their statements, however, fail to demonstrate the level of detail required to establish personal knowledge of Defendants' alleged state of mind. *See In re Daou Sys.*, 411 F.3d at 1016. Even if some of the SCAC's allegations do reach the "requisite level of particularity to withstand the first prong of the . . . confidential witness test," the allegations "fail to demonstrate the deliberate recklessness required to survive the second prong." *See Zucco Partners*, 552 F.3d at 998.

The SCAC alleges that CW-4 worked as Director of Marketing Intelligence at LifeLock from 2007 to 2012 and as Director of Corporate Development from 2012 to May 2014. (SCAC ¶ 149.) CW-4 states that he "was involved in the due diligence conducted for LifeLock's acquisition of Lemon and its Wallet App." (*Id.* ¶ 153.) CW-4 also states that the "due diligence teams gathered their research and data, [then] they presented their findings to the Executive Leadership Board," which included Defendants Davis and Power. (*Id.* ¶ 161.) CW-4 claims that "the fact that the Wallet App was not

PCI-compliant came up in discussions with the Executive Leadership Board" and that Defendant Davis was "aware of all the risks of acquiring Lemon." (*Id.* ¶¶ 164-65.) These allegations fail to provide sufficient detail to establish reliability or to be indicative of scienter. CW-4 never alleges that he attended discussions with the Executive Leadership Board and therefore the Court cannot determine whether his knowledge of what occurred at these meetings was based on his personal knowledge or secondhand information. *See Zucco Partners*, 552 F.3d at 996-97. Further, CW-4's allegations that Defendant Davis was "aware of all the risk of acquiring Lemon" and that the Executive Leadership Board "discussed ten to twenty risks involved with the purchase of Lemon" are too vague to create an inference of scienter because they do not specifically allege that PCI noncompliance was ever presented by the due diligence teams to either Defendant Davis or Power. These allegations fail to satisfy the PSLRA pleading requirements because they lack sufficient particularity to establish CW-4's reliability and personal knowledge of Defendants' alleged state of mind.

The SCAC alleges that CW-5 worked as Senior Executive Assistant to LifeLock's Executive Vice President of Corporate Development and Strategy Villi Iltchev and Chief Product Officer Steve Seoane from April 2013 to March 2014. (SCAC ¶ 169.) CW-5 only alleges that Iltchev and Seoane "were proud that they were able to release [the Wallet App] so fast" and that "Iltchev and the product department were still making sure the app was functioning properly and synching with LifeLock's technology." (*Id.* ¶¶ 171-73.) CW-5's statements fail to reference either Defendant Davis or Power and the Wallet application's compliance with PCI standards. These allegations do not meet the PSLRA pleading requirements because they lack sufficient particularity to establish CW-5's reliability and personal knowledge of Defendants' alleged state of mind. Considering the SCAC's scienter allegations individually and as a whole, they fail to sufficiently allege that Defendants intentionally or with deliberate recklessness made a misleading statement concerning LifeLock's or its Wallet application's compliance with applicable PCI security standards.

1

### 3.     LifeLock's Technology and Services

In the initial dismissal Order, the Court did not address Defendants' statements concerning LifeLock's technology or services because Plaintiffs argued that only those statements that referenced the FTC Order were false or misleading. (Dec. 17, 2014 Order at 6.) Plaintiffs now argue that Defendants' statements concerning LifeLock's technology and services are themselves "actionable misrepresentations." (Resp. to MTD at 11-12.)

### a.     SEC Filings

Plaintiffs have re-alleged the following statements from LifeLock's SEC filings as false or misleading statements:

> [A]s part of our consumer services, we offer 24x7x365 member service support. If a member's identity has been compromised, our member service team and remediation specialists will assist the member until the issue has been resolved." [(SCAC ¶¶ 213, 221, 229, 235, 248, 265 (same).)]
>
> . . . .
>
> **We regularly assess the effectiveness of our information security practices and technical controls.** In addition to regular external audits, we conduct internal security testing to ensure current practices are effective against emerging threats. Additionally, outside penetration tests are conducted on a regular basis. We ensure that our systems are free from critical vulnerabilities by conducting regular vulnerability scans and penetration tests. We also remain aware of publicly disclosed vulnerabilities in commercial and open source products, and remediate issues in a timely manner. [(*Id.* ¶¶ 214, 249 (same).)]
>
> . . . .
>
> We protect our members by constantly monitoring identity-related events, such as new account openings and credit-related applications. **If we detect that a member's personally identifiable information is being used, we offer notifications and alerts, including proactive near real-time, actionable alerts** that provide our members peace of mind that we are monitoring use of their identity and allow our members to confirm valid or unauthorized identity use. [(*Id.* ¶¶ 215, 220, 228, 234, 264 (same).)]

Plaintiffs argue that these statements are misleading because LifeLock failed to assess the effectiveness of its security practices, was unable to handle the number of alerts it received, and sent out a number of delayed alerts to its customers. (Resp. to MTD at 11-12, 18.) Defendants counter that these statements cannot survive the current Motion because they were alleged in the dismissed CAC and Plaintiffs' previous clarification that

only statements referencing the FTC Order still applies to the SCAC. (Doc. 83, Reply in Supp. of MTD ("Reply") at 3-5.) Defendants also argue that even if Plaintiffs were not barred from arguing that these statements are false or misleading, the SCAC fails to allege that LifeLock's service lapses were anything more than quality control issues; therefore, these statements are not actionable as securities fraud. (*Id.* at 4.)

Plaintiffs have failed to sufficiently allege that the statements concerning LifeLock's technology and services are actionable as false or misleading statements under the Exchange Act. The Court cannot conclude that product descriptions in LifeLock's quarterly and annual SEC filings are rendered false or misleading because the Company was unable to consistently deliver "24x7x365" customer service or "near real-time actionable alerts." *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977) (stating that federal securities laws may not be used to redress mere nondisclosure of corporate mismanagement). As discussed above, the SCAC fails to sufficiently allege the actual extent of LifeLock's practice of throttling and Plaintiffs have not responded to Defendants' argument that even if thousands of alerts were unsent, this lapse "may have been minuscule in comparison to the number of alerts sent." (*See* MTD at 12 n.24.) Although Plaintiffs argue that mismanagement or improper business practices are sufficient to support a claim for securities fraud where "deception, misrepresentation, or nondisclosure" are alleged, the SCAC fails to sufficiently meet this burden. (Resp. to MTD at 18 (quoting *Santa Fe*, 430 U.S. at 2476).) As discussed above, Defendants made a number of negative disclosures in both LifeLock's 2012 and 2013 Form 10-K. While these SEC filings stated that LifeLock offered "24x7x365" customer service or "near real-time actionable alerts" when describing its product, LifeLock specifically disclosed that it had experienced substantial growth, which has "place[d] a strain on [its] operational, financial, and management infrastructure" and warned that its "failure to effectively manage growth could have a material adverse effect on [its] business . . . [and] operating results." (2013 Form 10-K at 18; *see also* Doc. 53-3 2012 Form 10-K at 24 (same).) Based on these disclosures in LifeLock's SEC filings, the Court cannot conclude

1    that Defendants' statements describing their product and services were deceptive or

2    misleading.

3                    **b.        Advertisements**

4           Plaintiffs have also alleged for the first time that statements made in LifeLock's

5    advertisements are actionable as securities fraud. (*See* Resp. to MTD at 11-12 (citing

6    SCAC ¶¶ 218, 224, 226).) Similar to the statements above from LifeLock's SEC filings,

7    Plaintiffs allege that these advertisements contained false or misleading statements

8    because they misrepresent the capabilities of LifeLock's customer alert and credit

9    monitoring services. (*See* SCAC ¶¶ 219, 225, 227.) Defendants argue that the

10   advertisements alleged in the SCAC cannot support Plaintiffs' Section 10(b) claim

11   because there is no allegation that investors relied on these advertisements, as opposed to

12   the "SEC periodic reports" and "established market communication mechanisms,

13   including regular disseminations of press releases on the national circuits of major

14   newswire services," "communications with the financial press," and "analyst[] . . .

15   reports," as alleged in the SCAC. (MTD at 7-8 n.13 (quoting SCAC ¶ 284).) Plaintiffs

16   counter that reliance on the advertisements can be presumed because the SCAC alleges a

17   fraud-on-the-market theory of reliance. (Resp. at 11 n.5 (arguing that Plaintiffs relied on

18   "wide-ranging public disclosures," which includes the advertisements at issue); *see also*

19   SCAC ¶ 284.) Plaintiffs also argue that the advertisements alleged in the SCAC are

20   actionable statements because "advertisements can constitute statements made 'in

21   connection with' a securities transaction for purposes of a Section 10(b) claim." (Resp. to

22   MTD at 11-12 (citing *In re Carter-Wallace, Inc., Sec. Lit.*, 150 F.3d 153 (2nd Cir.

23   1998)).)

24          The Court cannot conclude that the advertisements identified in the SCAC

25   constitute violations of the Exchange Act. Liability extends to only those false or

26   misleading statements that were made "in connection with" the purchase or sale of

27   securities, and this requirement is satisfied when the statements were made "in a manner

28   reasonably calculated to influence the investing public." *See McGann v. Ernst & Young*,

102 F.3d 390, 393 (9th Cir. 1996) (quoting *Wessel v. Buhler*, 237 F.3d 279, 282 (9th Cir. 1971)). Documents such as press releases, annual reports, and investment prospectuses are typical sources of information used to guide investors. *See United States v. Arthur Young & Co.*, 465 U.S. 805, 810 (1984); *SEC v. Rana Research*, 8 F.3d 1358, 1362 (9th Cir. 1993). Plaintiffs rely solely on the Second Circuit case *In re Carter-Wallace, Inc. Securities Litigation* for the proposition that certain advertisements may also satisfy the connection requirement. In *Carter-Wallace* the Second Circuit concluded that a drug manufacturer's detailed advertisements that "us[ed] technical jargon and [were] published in sophisticated medical journals" may satisfy the "in connection with" requirement. *Carter-Wallace*, 150 F. 13d at 156-57 (noting that "[i]n an economy that produces highly sophisticated products, technical information is of enormous importance to financial analysts"). The court specifically stated that "[t]echnical advertisements in sophisticated medical journals detailing the attributes of a new drug could be highly relevant to analysts evaluating the stock of the company marketing the drug" and therefore the plaintiffs had met their burden of alleging the "in connection with" element in that case. *Id.* at 156. The SCAC fails to provide sufficient factual allegations demonstrating that reasonable investors would base their investment decisions on the advertisements in this case. As presented in the SCAC, the advertisements have little in common with both the types of communications typically relied upon by investors and the advertisements alleged in *Carter-Wallace*. The SCAC contains no allegations describing in which publications the advertisements appeared and, specifically, whether they appeared in publications reasonably used by market professionals to evaluate LifeLock stock. Plaintiffs have failed to sufficiently allege that the advertisements meet the "in connection with" element in alleging a violation of the Exchange Act.

### 4.    Whistleblower Complaints

Plaintiffs also argue that the SCAC sufficiently alleges that Defendants made false or misleading statements concerning "whistleblower" claims filed against LifeLock.

(Resp. to MTD at 2, 15.)[5] Plaintiffs specifically argue that the following statements were false or misleading:

> On January 17, 2014, we met with FTC Staff, at our request, to discuss issues regarding allegations that have been asserted in a whistleblower claim against us relating to **our compliance with the FTC Order.** Following this meeting, we expect to receive either a formal or informal investigatory request from the FTC for documents and information regarding our policies, procedures, and practices for our services and business activities. Given the heightened public awareness of data breaches and well as attention to identity theft protection services like ours, it is also possible that the FTC, at any time, may commence an unrelated inquiry or investigation of our business practices and our compliance with the FTC Order. **We endeavor to comply with all applicable laws and believe we are in compliance with the requirements of the FTC Order.** We believe the increased regulatory scrutiny will continue in our industry for the foreseeable future and could lead to additional meetings or inquiries or investigations by the agencies that regulate our business, including the FTC. [(SCAC ¶ 239 (quoting LifeLock's 2013 Form 10-K).)]
>
> . . . .
>
> **[W]e pro-actively requested and met with the FTC in January of this year to discuss some acquisitions [sic] that had been made by terminated employee. It's important to understand that we have then settled that matter favorably for LifeLock with the former employee and that former employee has now come back and agreed that we were not violating any laws for the term of the agreement with the FTC.** [(*Id.* ¶ 257 (quoting a statement made by Defendant Davis during an Investor and Analyst Day).)]

Plaintiffs also argue that the DBMR analyst reported that LifeLock "ha[d] settled a whistleblower lawsuit filed with the FTC by an ex-employee of the company for a modest amount, in the last month." (*Id.* ¶ 255.) Plaintiffs argue that these statements are false or misleading because they misrepresent the "number and status of 'whistleblower' claims against the Company." (*Id.* ¶ 240(c).) Plaintiffs specifically argue that although a former employee had settled his wrongful termination lawsuit in February 2014, a second former employee had filed complaints with the FTC and SEC and a whistleblower complaint under the Sarbanes–Oxley Act with the Department of Labor in August 2013, which had not been settled at the time the statements were made. (*Id.* ¶¶ 81-82, 256(a)-

---

[5] The SCAC alleges that LifeLock misrepresented the number of "whistleblower" claims against the company; however, former employee Stephen Burke filed a complaint against LifeLock alleging wrongful termination and invoked no whistleblower provisions. (*See* SCAC ¶¶ 71-83.)

(b), 259.)

The SCAC fails to sufficiently allege that the above statements are false because there are no allegations that LifeLock asserted that the whistleblower complaint referenced in each statement was the only complaint that had been filed against LifeLock. The Court also concludes that while the above statements fail to disclose the exact number of whistleblower complaints filed against LifeLock, they were not plausibly misleading because LifeLock disclosed in its 2013 Form 10-K that "there ha[d] been a recent increase in whistleblower claims made to regulatory agencies, including whistleblower claims made by former employees, which [LifeLock] believe[d] w[ould] likely continue." (2013 Form 10-K at 10.) Omitting specific details such as the number of whistleblower complaints made against LifeLock was not an omission that "affirmatively created an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody*, 280 F.3d at 1006. Because the omission of the specific number of whistleblower complaints faced did not plausibly render the above statements misleading, these statements are not sufficient to state a claim for securities fraud.

## III.   CONCLUSION

The SCAC does not adequately allege that the statements at issue were either misleading or made with scienter to violate Section 10(b) or Rule 10b-5. Because the Complaint in this case has been amended twice and Plaintiffs' Response does not indicate that further amendment would cure the deficiencies identified, further leave to amend is not warranted.

**IT IS ORDERED** granting Defendants' Motion to Dismiss Second Consolidated Amended Class Action Complaint for Violations of Federal Securities Laws (Doc. 77).

**IT IS FURTHER ORDERED** denying the Request for Judicial Notice in Support of Defendants' Motion to Dismiss Second Consolidated Amended Class Action Complaint for Violations of Federal Securities Laws (Doc. 79).

/ / /

/ / /

**IT IS FURTHER ORDERED** directing the Clerk to enter judgment dismissing Plaintiffs' Second Consolidated Amended Class Action Complaint for Violations of Federal Securities Laws.

Dated this 21st day of July, 2015.

Susan R. Bolton
United States District Judge